Good afternoon. May it please the Court, C.B. Kirshner, on behalf of Kyle Rodney, I would like to reserve five minutes for rebuttal. There are two reasons why the federal courts can consider the newly presented evidence in support of Mr. Rodney's ineffective assistance of trial counsel claim. First, Mr. Rodney satisfied the requirements of Section 2254 E2 because he was diligent in attempting to develop the factual record in state court. Second, even if Mr. Rodney hadn't been diligent, his failure should be excused because he was without the assistance of counsel during his state post-conviction proceedings. Neither the clear holding of Shin v. Ramirez, nor its rationale, apply to Mr. Rodney's situation. Counsel Judge Gould, if I could ask you a question, please. What exactly did your counsel say to the court about whether you wanted an evidentiary hearing? Gould, Jr. Your Honor, Mr. Rodney did not explicitly request an evidentiary hearing, and that's because under the statutes in Nevada, an evidentiary hearing must automatically be considered by the judge before relief can be granted. So there was really no need for Mr. Rodney to request a hearing. It would have been redundant. But he did request both appointment of counsel for the purpose of investigating. Correct. That is for collecting evidence. Exactly, Your Honor. And under this court's — And that would be a predecessor to any evidentiary hearing because under Nevada law, I think you need to have something to show before you can even get an evidentiary hearing. Yes, absolutely, Your Honor. And also, he — it's also true that under Shin, the evidence stands co-equally with an evidentiary hearing as to whether it's accessible or not accessible. So by asking to get the evidence, he was essentially asking for whatever it is Shin says you're supposed to be doing. I agree, Your Honor. And he also requested counsel citing the need for discovery. And in Nevada, you don't have a right to discovery until an evidentiary hearing is scheduled. So by referencing the need for discovery, he was essentially referencing the need for an evidentiary hearing as well. And under this court's prior holding in Alberni — excuse me, Alberni v. McDaniel, just the fact that he requested counsel is sufficient to satisfy the due diligence standard of E-2. So counsel — when he requested counsel at the first — at the direct appeal, that was denied. Is that correct? So he requested alternate counsel to counsel be appointed. And it was granted by the trial court. And then the Nevada Supreme Court reversed and insisted that trial counsel perfect the direct appeal as well, thus precluding my client's ability to raise any ineffectiveness claims during the direct appeal. But he did make that attempt at the onset. So really, he was as diligent as he could be. And he did identify this claim and specify that his attorney was ineffective for not calling an expert with regards to the victim's injuries, again, implying the need for an expert in post-conviction. It would be possible — Was that with regard to the first PCR or the second PCR? The first PCR, Your Honor. And certainly, there would be no way for him as an indigent, unrepresented, incarcerated Petitioner to retain his own medical expert and present a medical report, which is what we were able to do in federal court, just as we were able to reach out to trial counsel and get a declaration from him explaining his actions. That also would be nearly impossible for an unrepresented Petitioner. But, counsel, you also — you did have an opportunity, then, to go through full discovery on the case when the case was remanded. So after you obtained all this new evidence, assuming the district court judge had reviewed the new evidence, how would that have changed the ineffective assistance of counsel? How is the new evidence relevant to your ineffective assistance of counsel claim? Your Honor, it's relevant in several respects. First of all, absent the declaration from counsel, we would only be able to speculate about why trial counsel did or did not challenge the medical evidence, the medical testimony that was offered by the victim. But once the case was remanded and we had a chance to develop the factual basis, we were able to obtain a declaration from trial counsel who really acknowledged his failures and said, if I had known that there was a basis to challenge the medical testimony, I would have done it, and here's a list of things that I could have done. How do you meet the second prong of this one test? Where's the prejudice? The prejudice is obvious here, Your Honor, because the victim's testimony was absolutely critical to the prosecution's case. He was really the only witness that established the alleged intent to kill for the attempted murder and conspiracy to commit murder charges, also substantial bodily injury because there was no medical evidence presented. Had trial counsel impeached Mr. Monco either directly with the medical records or through his own medical expert and shown not only that Mr. Monco was lying, but that he was lying on the stand in front of the jury, the jury would have had every reason to doubt the credibility and veracity of his entire testimony, which largely went uncooperated. And once the jury— Counsel, Judge Gould, if I could interject, is it correct that your client swung a baseball bat and bashed the head of the victim? No, Your Honor, that is not correct. It was actually the co-defendant, Mr. Downing, that had the bat. It was also not a full-size baseball bat to the extent that it's relevant. It was hidden up his sleeve. It was described as a two-foot-long bat that I guess is used in fishing, is what the testimony was. I'm not a fisherman, so I don't know. But the witness, Ashley Womack, who was in the car, said she didn't even know Mr. Downing had the bat until he pulled it out of his sleeve. So obviously not a full-size bat. But she said very clearly in her testimony that she never saw Mr. Rodney, my client, with any weapon and never saw him strike a single blow. She also said she was looking away a fair amount. She did. And somebody had a knife. It's unclear. There were witnesses that said the injuries looked consistent with the knife. There was no expert who said a knife was used. So really that testimony also only came from the victim. But certainly he was injured. We're not disputing that he was assaulted, he was injured. But the intent to kill that's relevant for both attempted murder and conspiracy to commit charges, that was really only established by the victim himself. So — We're essentially relying on this medical testimony, not for itself, but for the credibility of the witness as to what else happened, what happened to him. Yes, largely. I think the amount of the injuries themselves are also relevant to whether there was substantial bodily harm for — And as to that issue, there actually hasn't been a COA granted. Is that right? That's correct, Your Honor. The district court did something very unusual and granted the COA on this claim as to the attempt murder and conspiracy to murder charges, but not to the remaining charges. I'm not sure how that is workable in the long run. I'm not aware of this court ever finding ineffective assistance of trial counsel for certain charges, but not other charges. If Mr. Rodney had ineffective counsel, then counsel was ineffective throughout the entire trial, not with regards to one or two charges. But yes, that is what the district court said. Counsel, counsel, let me tell you what is bothering me about your client's defense. And correct me if I'm wrong in this. But as I understand it, whether your client swung the bat or whether it was swung by Dowling, by his co-conspirator, he could be equally liable or he could be liable for attempted murder for aiding and abetting his pal. Right? That's the first point. Second point is I don't really see a difference if the bat is a full size, a full size bat like for baseball or if it's a little short bat, as you described, like the kind they use in fishing to kill fish. The reason is that in fishing, because I used to fish years, years ago, we used those little short bats to kill the fish after they were in the boat so they wouldn't jump around and screw things up. And sometimes they're weighted, they're short, but weighted with lead. Be more effective. So either way, whatever kind of bat it was, it seems to me that because people were held to the natural and probable consequences of their acts, it looks to me like your client or his co-conspirator or your client through his co-conspirator had an intent to kill. Your Honor, I'm glad you brought up both those points. With regards to the size of the bat, really to the extent that it has any importance is that if Ms. Womack did not see it and did not know that Mr. Downing had this bat until he pulled it out from his sleeve, where it was — Why does that matter? Because it calls into question whether or not my client, Mr. Rodney, knew that his co-defendant had that bat either until he produced it. But there clearly had to be another weapon as well. And it appears to have been a knife because he was cut up and he needed stitches all over his face and head. Because he was sliced up is my understanding. Now, I — well, go ahead, and then I have a question. Well, I'm not sure that it goes without saying that there was a knife. People can receive lacerations from other types of assaults. But as to Judge Gould's question about conspiracy and aiding and abetting liability, in Nevada, both the jury instructions and the statutes are very clear that even when you are charged under a vicarious theory of liability, those charges, as it pertains to attempt murder and conspiracy to commit murder, still require specific intent be proven on the part of the defendant being tried. So even if Mr. Downing had that intent, the jury would have had to believe that my client, Mr. — excuse me, Mr. Rodney, had the specific intent to kill before he could be convicted even under a vicarious theory of liability. But weren't the injuries that the victim sustained enough to show that intent? I mean, if you go through the trial testimony, it was not justice testimony, but the types of injuries, the fact that he was left unconscious, he was bleeding, left in a pool of blood. I just don't see — I'm having trouble seeing how the additional evidence that you were able to discover after the remand would have contradicted or helped your client's case during the trial. Because it shows that the testimony presented at trial regarding the injuries was largely falsified, that he certainly had some injuries. He did not suffer brain damage. He was not near death. Well, he did have a concussion. He did have — he was — he did, according to other people, become unconscious later as well as then. That's a form of brain damage. It may not have been permanent, but it was brain damage. He had — he did say in the existing records that he was numb on one side, to the doctor, that he did say that. As to the seizures, he — that was kind of unclear. He testified that he saw other doctors, and no one's ever gone to find any evidence about what he told other doctors. We certainly tried, Your Honor. And at this point, I would argue that that was on the respondents, that they had additional medical records supporting Mr. Monko's testimony. But in general, what he did was exaggerate a lot, right? He said he had hundreds of stitches, and he had 52 stitches. 52 stitches is still a lot of stitches. It is. He also claimed that when he went back and was readmitted to the hospital with the MRSA infection, that that was related to this initial assault. Well, actually, it probably was, because a MRSA infection probably came from being in the hospital first. But that's not what the medical records stated. They didn't say it one way or the other way. But MRSA infections, as I understand it, ordinarily come from the hospital. They certainly can. But he told the jury that the MRSA infection was close to spreading and killing him, and there was no evidence of that, that the medical records show that it was likely from a bug bite or an inflamed hair follicle that had nothing to do with the original assault. But the real question is, if you take all that away and you use what the actual records show, and this is my question, by the way, how come we don't have the photographs? I'm sorry, Your Honor? We don't seem to have the photographs in the record. I did not include them in the ER. I would actually have to check whether they were filed by the state in district court. In district court, the state is responsible, excuse me, respondents are responsible for filing the state court record. I'm not sure what they included and didn't include as far as the photographs off the top of my head. Well, I will ask both attorneys that I really would like to see those photographs. And I don't understand why we don't have them. Because they were shown to the jury repeatedly, as I understand it. Yes, Your Honor. All right. So assuming that they show what the district court said they showed, which I don't know because they don't have them, they seem to show that he did have a permanent scar. He did have some injuries to his eyes. He had the apparently these markers would demonstrate that he was bleeding around his eyes and so on. That's according to the expert we submitted. So it appears that he had quite serious head and skull injuries. He did have several facial fractures. He had nose fractures, et cetera. He did, Your Honor. And I think the most important facts are this. One, he was the only witness to testify to one of the defendants saying to him, we're killing you. You're dead now. No one else heard this. So his credibility was very key as far as that happening, because it would go to the existence of intent. What Ms. Womack heard was my client, Mr. Rodney, saying, stop, I've got it, let's go, presumably referring to the money showing that he had intent to commit a robbery. But it does not show an intent to kill for the attempted murder and conspiracy to commit murder charges. Okay. You're actually behind your time. So thank you. And we will give you two minutes to rebut. Thank you, Your Honors. Thank you, Your Honors. Good afternoon, and may it please the Court. Deputy Attorney General Elsa Felgar on behalf of respondents in this matter. We ask that this Court affirm the decision from the Federal District Court and hold that Rodney is not entitled to habeas relief. This is for two reasons. First, Shin V. Ramirez precludes the consideration of new evidence. And second, Rodney's ineffective assistance of counsel claim is not substantial, and therefore, he fails to meet the Martinez v. Ryan standard in order to overcome the procedural bars. I'll start with issue one. We could, couldn't we, skip all of that and simply decide that his IAC claim fails in the merits? That's correct, Your Honor. With or without the additional evidence? That's correct. I will start with issue one unless this Court has any other questions.  So, Shin V. Ramirez precludes consideration of new evidence. Ramirez procloses using Martinez to develop new evidence unless the petitioner can satisfy 2254E2. And that's because Martinez addressed a very specific kind of claim, which is ineffective assistance of trial counsel. The holding was limited because this is an equitable judgment, and that ineffective assistance of trial counsel claims were deemed uniquely important. So the focus was on being able to raise the claim itself. Well, a claim usually is a statement of facts and law. And for some reason, they've been now torn apart so that the factual record is not part of the claim. I would have thought it was part of the claim, but that seems to be where we are after Shin. Go ahead. Well, the petitioner can still raise, develop evidence, excuse me, in state court even if the petitioner is pro se. And here, Ronnie— But the premise of Martinez is that he really can't without, he has no lawyer. And that's why Martinez came out the way it did. So essentially, it seems to me that Shin has, especially if read as broadly as you would read it, eliminates Martinez. So one possibility is that it doesn't because it was concerned with ineffective accounts, ineffective assistance of counsel claims, which are more complicated and become very overlapping. And if the person has no lawyer at all, and as here did try to get a lawyer and did try and said why he wanted a lawyer, which was to develop evidence, which he had to do in order to get an evidentiary hearing. And there is a now Bernie opinion which does say that that's sufficient to be a lack of fault. Why isn't that at least a way of reading Shin, which doesn't accuse the Court of having overruled Martinez without saying so? Well, if I understand your question, this Court lacks equitable authority in order to amend the statute, which is 254E2. And Shin v. Ramirez really brings home that point that— Well, right. But everybody agrees that there is a fault component to E2 at the outset. I'm sorry. Could you repeat that? That there is a fault component to E2 at the outset. Yes. Which the Michael Williams case was very clear about and which Shin reinforced. So the going in question is whether this person was at fault for the record not being developed. And under Williams v. Taylor, the petitioner is still at fault, even if he doesn't have counsel. And that has been well established. But what if he continued in this case to ask for new counsel and to ask for, even at the trial level, wanted to dismiss this current counsel because the current counsel was ineffective? And so I don't know how — what else could he have done to be diligent pursuant to the 2254E2 section? Well, he would have had to plead facts that, if true, would have entitled him to relief. That's the standard in Nevada. And the court determined that he did not. And therefore, he was not — an evidentiary hearing was improper. Here, in his first post-conviction petition, he stated that counsel never presented any witnesses with regard to the wounds. And that's — So is your position that he was diligent, but because of the extent of the injuries, then the ineffective — the claim was not substantial under Martinez? No, Your Honor. My stance currently is that he was not diligent in state court. And he wasn't diligent because he pled a bare claim. He stated simply that counsel never presented expert witnesses. And he said, why? He said, because I can't investigate this from prison, and that's why I need a lawyer. He didn't state that in his petition. Yes, you did. And even if he did, that's still not enough for him to — he didn't plead the facts that he needed to in order to show that there were facts that were at issue. He had to show that there were some contradictory facts. And therefore, it prompts the district court for an evidentiary hearing, because now there are facts that are at issue. And there's no specific language that he had to use, necessarily. But he did have to at least present facts that were — that he believed were in contradiction with what happened at trial. And that just didn't happen here. And he didn't follow — Well, he — meaning he had to name an — this is what the state court said. He had to name an expert who he would have — could have used. Is that what he was supposed to do? That could have been one of the things that he could have done. And he was supposed to do that while he was incarcerated in prison, find some expert. Not to find an expert, Your Honor. No? No. He was — if he had — because he was at trial, he knew what was presented. And if he felt like there should have been — But he didn't know what wasn't presented. This was not within his knowledge. He knew that the — now, his lawyer did have all of the medical records from this one hospital. Whether there were other medical records, no one seems to know. But we have no knowledge that he had the medical records. And his lawyer was quite uncooperative, even after the fact, when he did have a lawyer. So how was he going to deal with it without a lawyer? His original lawyer, when the eventual lawyers tried to get material from him, including the medical records, was not cooperative. I understand. And it comes back to the fact that he never pled those facts. I understand that. But where was he supposed to get the facts from? He said that he needed a lawyer so he could investigate and get the facts. He didn't need to point to a specific expert. He didn't need to point to specific medical records. He didn't need to know the name of the expert, for instance. He just simply needed to show that there was a reason to have these experts. I mean, that's a sensible requirement, if the facts are facts having to do with what he did and what he knew. But these are facts about the medical records of somebody else and the medical situation of somebody else. How is he supposed to allege anything except by making it up? Well, he was able to write his petition, and so he stated that there was something to do with the victim's wounds. If he was concerned with the credibility of the victim, then he could have alleged facts regarding the medical records that would have called into question the — By making them up? By speculating? By doing what? No, Your Honor. By simply having those concerns. If he truly believed, like he does now, that there was some additional evidence that could have helped his claim, then he could have raised that in state court, but he did not. And so, what he's stating — What's an example of something he could have said from his own knowledge that would have been helpful with regard to the medical situation? He could have said something along the lines of that the victim, for instance, lied, and medical records would show that. Something along those lines. But he wouldn't know that if he hadn't seen the medical records. But he did know that the victim exaggerated, I believe. I believe that that was something that he had known, or that he was alerted to that. And so, he could have — Simply — Oh, I'm sorry, Your Honor. Counsel, let me ask you a short question, I hope. Short answer. From a different angle. What's the government's position as to the best evidence in the record that was admitted that shows an intent to kill? I believe it was the photographs. Where are the photographs? They were, I believe, in the district court record. We don't have them. And I apologize — And if you think that's the best evidence, you'd think he would have given them to us. And I apologize, Your Honor. If — Would you do that, please? Yes, we can do that. Absolutely. And that truly does show when the jury saw those photographs. And I think also, not just the photographs, we can take that aside. And you just look at the victim who testified and showed his scar. The jury was in that room and saw the scar and heard the victim's voice and heard what he had to say. And they still found him credible. And that was for the jury to decide. Did it come out in trial? I think it did. When he said there were hundreds of stitches, there weren't, right? Right. But that's not material, the specific number. The fact that he got stitches is what was material. And he didn't lie about that material fact. And in addition, the seizures and the numbness and the sense of smell and taste — I mean, he testified to that five months later. And really, we have medical records here that are from the incident or two weeks later. It's possible that he never said that to the doctor. It appeared later. Does the — I'm sure you saw the newly discovered evidence that was not considered by the district court. But had — what is your position on that? Had the district court reviewed that newly discovered evidence and considered it, would the district court have reached the same decision? Yes, because that new evidence doesn't really matter here. It doesn't add anything that the district court didn't — or that the district court did consider, which was like a 12-page, I believe, 12-page medical report. But whatever happened two weeks later with the infection, for instance, that doesn't go to attempt murder. Attempt murder is how the weapon — can be how the weapon was used during the commission of the crime. For instance, a bat to the back of the head or multiple blows to the head, that can be considered attempt murder. A knife to the face can be considered attempted murder. Anything about the new evidence that would contradict any of that testimony or put into question any of that evidence? I don't believe so. The material — the material facts, not — I'm not talking about the specifics about stitches or little things that maybe the victim had said. I'm talking about mainly material facts. And the large scope, no, it would not have. It doesn't add anything. And it doesn't, again, doesn't really matter because at the end of the day, we have to look at what the intent was and the way that the knife went to the head, a bat to the neck, and also the fact that Rodney and Downing walked up together to the house. Womack drove him. They — or both of them, and then they both walked out. And they were together during this attack. And that shows conspiracy and intent — or, I'm sorry, yes, attempted murder. And therefore, any additional medical record evidence doesn't really go to that. And it doesn't matter here. Counsel, I have another question, please. Yes. As I understood it, and correct me if I'm wrong, the AEDPA applies to this case? Yes, Your Honor. So, in your argument, is there any significance to that statute, the AEDPA, as to whether there's a right to a habeas petition here? Well, this court would have to give deference to the state court. So, that would be the most important and major function of AEDPA. And so, here, the findings — Well, wait a minute. We don't have to give deference because they didn't decide this question. I mean, it asked issues they didn't decide. We don't give them deference. I mean, the whole argument for having a Martinez cause and prejudice is that it was defaulted in state court. So, the state court didn't decide the trial court IAC claim because they said it was defaulted. So, there's no AEDPA deference here. The relevance of AEDPA is 2254E2, right? Yes. Which is an AEDPA provision. Yes, Your Honor. Okay. I apologize. Yes. Yes. And I see that I am out of time. Okay. Thank you very much. Thank you, Your Honors.  Good afternoon. Briefly, I would refer this Court to the expert medical report that was presented in the district court where it was stated that Mr. Monko's cuts were described as superficial lacerations and that ultimately he did not suffer any injuries that were life-threatening. But that's not required. But, I mean, that's not a useful conclusion for you because neither the battery claim for substantial harm or the intent to kill requires life-threatening injuries, does it? No. It would certainly be evidence of an intent to kill. The only evidence here of my client's intent was this statement, you're dead, we're killing you now. Mr. Monko was the only person that heard that statement. His credibility was, therefore, absolutely key to the prosecution's case. As my opposing counsel stated, the photographs and Mr. Monko's testimony were the evidence of intent to kill. And if the jury had known that Mr. Monko had lied about the extent of his injuries, known that he had lied— But lie is kind of a strong word in the sense that he exaggerated, no doubt about it. But lie suggests that he had some motive. He didn't really have a motive. I mean, he just, you know, was a slightly hysterical person, as far as one could tell. But he certainly was quite severely injured, however you look at it. Injured, yes. The severity would have been clear based on a medical expert report, which was not presented at trial. And to the extent that there is still doubt in this Court about the extent of the injuries, about whether there are other medical records still floating around out there that we haven't received as part of discovery, and whether the expert report would go to whether he was exaggerating or lying, then we would ask that the case be remanded for an evidentiary hearing, which is permissible under E-2. Okay. Thank you, Your Honor. Thank you very much. Thank you both for your useful arguments. And the case of Rodney v. Garrett is submitted. But I really would like to see those photographs.
judges: GOULD, BERZON, Marquez